1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ANDREW MEEKS,

      Plaintiff

v.

NEVADA DEPARTMENT OF
CORRECTIONS, et. al.,

      Defendants

Case No.: 3:18-cv-00431-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 26

This Report and Recommendation is made to the Honorable Miranda M. Du, United

States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28

U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 26, 26-1 to

26-12, ECF No. 28-1, 28-2, ECF No. 30 (manually filed DVD), ECF No. 32 (errata).) Plaintiff

filed a response. (ECF nos. 40, 40-1 to 40-3.) No reply was filed by Defendants.

After a thorough review, it is recommended that the motion be granted in part and denied

in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 1-2.) The

events giving rise to this action took place while Plaintiff was housed at Northern Nevada

Correctional Center (NNCC). (*Id.*) Defendants are Isidro Baca, Donny Cook, Shane Escamilla,

John Henley, and David Vest. The court allowed Plaintiff to proceed with certain State law

claims, discussed *infra*, against the NDOC and State of Nevada, but the NDOC and State of Nevada were dismissed with respect to the federal claims proceeding under section 1983. (ECF No. 7 at 19:3-7.)[1]

On screening, Plaintiff was allowed to proceed with the following claims (Screening Order, ECF No. 7.) :

**A. Count I**

Plaintiff was allowed to proceed with a retaliation claim against Vest under the First Amendment and Article 1, Section 9 of the Nevada Constitution in Count I. This claim is based on allegations that on May 6, 2017, Plaintiff woke to a crashing sound in his prison cell, and his personal fan was on the floor and broken, and the cable cord to his personal television was ripped out of the back of the set and dangled from the cell window. Plaintiff learned that this occurred because Vest had snatched Plaintiff's television antenna through the cell window from the outside, causing it to dislodge from the back of the television and knock the fan to the floor. Later that morning, Plaintiff was walking to the dining hall for breakfast and he approached Vest, and told Vest that he would be filing a grievance about the property damage. Vest then rushed to "shakedown" Plaintiff's cell while Plaintiff was eating breakfast. Vest left Plaintiff's cell in disarray and retaliated further by confiscating Plaintiff's television set under the false pretense that it was altered property and illegal for Plaintiff to possess.

---

[1] Typically, the State of Nevada and arms of the state, such as NDOC, cannot be sued in Federal court due to immunity from suit under the Eleventh Amendment. *See* Nev. Rev. Stat. § 41.031(2); *O'Connor v. State of Nev.*, 686 F.2d 749, 750 (9th Cir. 1982). The State may consent to federal court jurisdiction over state law claims when it removes a case from a state court to federal court. *See Weidner v. Nevada*, 2:16-cv-02301-KJD-NJK, 2017 WL 5985563, at *2 (D. Nev. Nov. 30, 2017); *Perez v. State of Nevada*, 2:15-cv-01572-APG-CWH, 2016 WL 4744134, at *4 (D. Nev. Sept. 12, 2016). Here, the case was removed from State court; therefore, the State and NDOC have waived immunity from suit with respect to the State law claims proceeding against them.

**B. Count II**

Plaintiff was allowed to proceed with a retaliation claim against Vest, Escamilla, and Cook, under the First Amendment and Article 1, Section 9 of the Nevada Constitution in Count II. This claim is based on allegations that later that morning, Cook told Plaintiff he should go to the NNCC property sergeant and request the return of his television set. Vest then walked into the unit to give Plaintiff an unauthorized property form for the confiscated television set. Plaintiff told Vest he would be filing a lawsuit for retaliation for the shakedown of his cell and confiscation of his television. Vest said the shakedown was a "compliance check." Plaintiff argued he knew the difference between a compliance check and a shakedown, and Vest threatened to show Plaintiff the difference. Vest then went to Plaintiff's cell and searched it with vigor, saying: "Now this is a shakedown. You wanna sue me for a shakedown? This is a shakedown." Vest and Escamilla trashed Plaintiff's cell, and confiscated and destroyed more of Plaintiff's personal property. Plaintiff pleaded with Cook to intervene, but Cook just watched and told Plaintiff, "you shouldn't have pissed him off."

**C. Count III**

Plaintiff was allowed to proceed with an excessive force claim under the Eighth Amendment as well as Article 1, Section 6 of the Nevada Constitution, as well as State law assault and battery tort claims against Vest in Count III. These claims are based on allegations that after the second shakedown of his cell, Plaintiff followed Vest as he left the unit and told Vest he was going to talk to Vest's superiors about Vest denying him the documents. At that point, Vest turned around, extended his hand and yelled, "If you don't wanna be the next Rodney King back off!" Vest's hand touched Plaintiff's chest with minimum force. Plaintiff quickly stepped back and slipped on the sidewalk and fell, but was not injured by the fall. He got up and

shouted to the others about Vest's Rodney King comments. All of a sudden, Escamilla came

from behind and pointed a pepper spray gun at Plaintiff, yelling at him to get down. Vest also

yelled at Plaintiff to get down. While Plaintiff lay defenseless on his belly, Vest pounced on

Plaintiff's back with his knee, and placed him in an "arm bar" while pressing his knees into

Plaintiff's kidneys, and pulled his shoulder, causing it to be hyperextended. Plaintiff cried out

that Vest was hurting him. Plaintiff was not resisting. As a result of the use of force, Plaintiff

avers that he could not stand up straight for eight to ten days due to back pain. His shoulder was

injured for months after the incident and was immobile. His range of motion continues to be

limited and he needs help getting in and out of his top bunk bed, and he is in pain anytime he is

placed in handcuffs from behind.

**D. Count IV**

Plaintiff was allowed to proceed with a deliberate indifference to serious medical needs

claim under the Eighth Amendment and Article 1, Section 6 of the Nevada Constitution against

Vest in Count IV, as well as State and federal retaliation claims against Vest in Count IV. These

claims are based on allegations that after he was injured by Vest, he was placed in segregation.

The next day, he was in so much pain he could not stand up straight or walk to get his food. He

knew he needed immediate medical attention, and so he wrote an emergency medical grievance.

Vest came to respond to the emergency grievance, and told Plaintiff he had a reply to it and he

should "agree or disagree." It turned out the document Vest provided Plaintiff was a blank

grievance form, not a response to Plaintiff's grievance. Vest walked off and laughed at Plaintiff,

depriving him of medical attention as well as the ability to seek redress for his suffering.

**E. Count V**

Finally, Plaintiff was allowed to proceed with federal and State retaliation claims against Vest in Count V, as well as federal and State due process claims against Baca and Henley in Count V. These claims are based on allegations that in retaliation for Plaintiff's threats to file grievances and sue him, Vest filed false disciplinary charges against Plaintiff asserting he failed to follow rules and regulations and for possession of unauthorized property. The property charge was dismissed; however, at the July 4, 2017 disciplinary hearing, Henley found Plaintiff guilty of failing to follow rules and regulations. The charges did not state what rule or regulation Plaintiff failed to follow and Henley found Plaintiff guilty of a false report with no supporting evidence. Plaintiff appealed on July 9, 2017, and Baca denied the appeal, reasoning that Vest said the television was altered and was contraband, even though the property charge had been dismissed.

**F. Defendants' Motion for Summary Judgment**

Defendants now move for summary judgment, arguing: (1) the evidence does not support the State law claims of assault and battery; (2) no private cause of action exists for the Nevada constitutional claims; (3) if there is a private cause of action for the Nevada constitutional claims, the NDOC employees are entitled to discretionary immunity; (4) since the State law claims against the NDOC employees fail, so do the claims against NDOC and the State of Nevada based on respondeat superior; (5) Plaintiff failed to exhaust his administrative remedies; (6) the evidence does not support the federal claims; and (7) Vest is entitled to qualified immunity on the excessive force claim.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

1   come forward with evidence which would entitle it to a directed verdict if the evidence went

2   uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

3   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

4   *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

5   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

6   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

7   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

8   party cannot establish an element essential to that party's case on which that party will have the

9   burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

10          If the moving party satisfies its initial burden, the burden shifts to the opposing party to

11   establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

12   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

13   dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

14   be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

15   *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

16   (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

17   by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

18   U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

19   pleadings and set forth specific facts by producing competent evidence that shows a genuine

20   dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

21

22

23

# III. DISCUSSION

**A. Exhaustion**

**1. Standard**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). Unless the failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion for summary judgment. *See id.* (*overruling in part Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b) motion").

"If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.* at 1168, 1170-71 (citations omitted). Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff  "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)). The ultimate burden of proof, however, remains with the defendant. *Id.*

1    The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely

2  or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion."

3  *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the

4  agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)."

5  *Id*. (emphasis original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).

6  Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison

7  grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v.*

8  *Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's

9  requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v.*

10  *Bock*, 549 U.S. 199, 218 (2007).

11    To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross*

12  *v. Blake*, 136 S.Ct.1850, 1858 (2016). "Accordingly, an inmate is required to exhaust those, but

13  only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action

14  complained of.'" *Id*. at 1859 (quoting *Booth*, 532 U.S. at 738).

15    NDOC's administrative remedies are set forth in Administrative Regulation (AR) 740.

16  (ECF No. 26-5.) AR 740 requires an inmate to timely proceed through informal, first and second

17  level grievances before filing a lawsuit. (*Id.*)

18    **2. Argument**

19    Defendants argue that Plaintiff's complaint should be dismissed because he failed to

20  exhaust his administrative remedies. According to Defendants, Plaintiff filed one grievance,

21  number 20063047730, alleging retaliation on the part of Vest, but they contend his second level

22  grievance was filed well after the time limits set forth in AR 740. Therefore, they assert that the

23  retaliation claims should be dismissed. In addition, Plaintiff filed a grievance to appeal his

disciplinary charges, which Baca denied. They claim there is no indication that Plaintiff ever appealed this decision to the second level; therefore, they argue the due process claims should be dismissed. Finally, they argue that the record shows no evidence of Plaintiff filing any other grievances related to his retaliation, excessive force, due process or deliberate indifference claims. (ECF No. 26 at 17-18.)

Plaintiff argues that there is evidence he filed many grievances that were returned "unlogged" without a grievance number to track, and that Defendants did not produce these grievances so the court could discern whether they were properly rejected.

Next, he argues that the grievance system is a quagmire. He states that under the rules, inmates can only grieve one "issue" at a time, but they do not define an issue or say whether it means one "claim" or one "incident." He argues that if an inmate were to file a grievance stating he suffered from excessive force and retaliation, this would be construed as two issues and could be rejected. He says there is also a rule that an inmate cannot file a duplicate grievance about the same issue. So, if an inmate files a grievance for retaliation and another grievance for excessive force that stemmed from the same incident, the second grievance could be rejected as duplicative. Moreover, the grievance rules state that only one grievance can be filed per week and a grievance must be filed within a month to be considered timely. Therefore, he contends that if an incident involves many claims, he would not be able to timely file a grievance for all of the claims under this rule.

Finally, he contends that he did appeal his disciplinary grievance to the second level, but he never received a response to the second level grievance.

### 3. Analysis

#### a. Grievance 20063047730

Plaintiff submitted the informal level form for grievance 20063047730 on May 11, 2017, which he stated was an appeal from an emergency grievance pursuant to AR 740.10(5). That section states that if an inmate requests further review of a claim not deemed an emergency, the inmate may file a grievance appeal commencing at the informal level. (AR 740.10(5) at ECF No. 26-5 at 15; informal level grievance form at ECF No. 26-6 at 3.) The next page included in Defendants' exhibit is the emergency grievance form, where Plaintiff stated that Vest was conducting a campaign of retaliation against him when he came into Plaintiff's cell and took his television set because Plaintiff told him he was filing a grievance/property claim against Vest for damaging his fan and television set earlier. (ECF No. 26-6 at 4.) It is unclear whether there were additional pages that comprised the informal level grievance, or the emergency grievance, but Defendants' submission appears to be incomplete.

There is an inmate grievance report with a transaction date of June 8, 2017, stating that the grievance was "partially granted" and that the grievance was being forwarded to the Inspector General's Office for further review. (ECF No. 26-6 at 2.)

Defendants' exhibit does not contain a first level grievance from Plaintiff or a first level grievance response. Instead, there is a second level grievance dated July 31, 2018, which states it is an appeal of the "1st level screen out" pursuant to AR 740.03(5), (6). AR 740.03(5) provides that if an inmate's claim is deemed inappropriate for review or not within the intended scope of the regulation, the inmate may not appeal the decision to the next level unless the inmate can provide evidence the grievance is within the scope of the regulation or NDOC has the authority to grant the remedy or action being requested. (ECF No. 26-5 at 6.) AR 740.03(6) states that an

1  inmate dissatisfied with the response to a grievance at any level may appeal the grievance to the

2  next level, "*unless* the action requested has already been *granted or partially granted* at a lower

3  level." (AR 740.03(6) at ECF No. 26-5 at 6, emphasis added.) The regulation subsequently states

4  that if a grievance is "granted" at any level, the grievance process is considered complete and the

5  inmate's administrative remedies exhausted, and the inmate cannot appeal the decision to a

6  higher level. If the inmate files a grievance to a higher level after it has been granted at a lower

7  level, "the grievance will be screen[ed] out and the notation in the rejection form will state that

8  the grievance has already been granted." (AR 740.03(6)(C) at ECF No. 26-5 at 6.)

9       The next document in Defendants' exhibit is a "suggested" second level grievance

10  response from Pam Del Porto dated November 1, 2018. The "suggested" response states that

11  Plaintiff was answered correctly at the informal level, and his allegation was forwarded to the

12  Inspector General for further review. The "suggested" response goes on to state that the first

13  level grievance (which has not been supplied to the court) was rejected because Plaintiff did not

14  sign for it, nor did he sign the grievance, and the second level grievance was submitted almost a

15  year later. (ECF No. 26-6 at 5.)

16       There are several issues with Defendants' argument regarding grievance 20063047730.

17  First, an incomplete record is insufficient to establish the failure to exhaust administrative

18  remedies. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled on other grounds by*

19  *Albina v. Baca*, 747 F.3d 1162 (9th Cir. 2014). The court cannot tell whether the informal level

20  grievance and emergency grievance that follows are complete records of what Plaintiff submitted

21  to the prison, though it appears they are not. Moreover, Defendants' submission is completely

22  missing the first level grievance and first level response. Then, at the second level, there is a

23  "suggested" response, so it is not clear whether this is the final response Plaintiff received. Thus,

1  Defendants have not met their burden of demonstrating that Plaintiff did not exhaust his

2  administrative remedies through this grievance.

3      Next, the grievance was "partially granted" at the informal level, stating that Plaintiff's

4  allegations were forwarded to the Inspector General for review. An inmate is not required to

5  complete the administrative review process where the grievance is granted or partially granted to

6  the inmate's satisfaction. *See Harvey v. Jordan*, 605 F.3d 681, 685 (9th Cir. 2010). AR 740.03(6)

7  itself states that an inmate may not appeal a grievance to the next level if it has been "*granted or*

8  *partially granted* at a lower level." The regulation goes on to state that if a grievance is "granted"

9  at any level, the grievance process is considered complete. That part of the regulation does not

10  mention "partially granted," but the prior section makes it clear that if the grievance is "partially

11  granted," as it was here, the inmate *cannot* appeal to the next level. If the inmate cannot appeal to

12  the next level, it would seem that the process is complete, and no further administrative avenues

13  are available to the inmate under AR 740. Since Plaintiff's grievance was partially granted at the

14  informal level, Plaintiff exhausted available administrative remedies under this grievance.

15      Finally, because the grievance documentation submitted by Defendants is incomplete, the

16  court cannot discern what issues Plaintiff raised in this grievance. It is possible that the grievance

17  only served to exhaust administrative remedies as to certain issues or claims; but the court cannot

18  make that determination at this point.

19      Even though the court has found Defendants did not meet their burden, the court will

20  address Plaintiff's argument that in effect the grievance process was unavailable to him because

21  NDOC's AR 740 is "so opaque that it becomes, practically speaking, incapable of use" due to the

22  failure to distinguish between issues and claims, and the prohibition on filing duplicative

23  grievances and limit on the number of grievances an inmate may file. The court acknowledges

that the provisions of AR 740 cited by Plaintiff *could potentially* create a problem for an inmate trying to exhaust administrative remedies with respect to multiple claims that arose out of a single incident. That being said, Plaintiff does not assert how those purported problems with AR 740 applied directly to the filing of *this* grievance. In other words, asserting the argument in the abstract, without applying it to the situation at hand, is insufficient.

### b. Grievance 20063051288

Plaintiff submitted an informal level grievance form on July 9, 2017, which he stated was a disciplinary appeal. In that grievance, he recounted events that give rise to his claims in detail. (ECF No. 26-4 at 3-16.)

There is a memorandum from Baca dated August 3, 2017, denying the appeal. (ECF No. 26-4 at 2.)

Defendants argue there is no indication that Plaintiff ever appealed this decision to the second level; therefore, the due process claims should be dismissed.

Once again, Defendants' record of this grievance is incomplete. Defendants argue that Plaintiff never appealed to the second level, but they do not provide the first level grievance or response. Moreover, Plaintiff provides evidence in his response that he did appeal the matter through the second level, including his own declaration, the declaration of inmate Cross, and a back copy of the second level grievance. (Pl. Decl., ECF No. 40-1 at 23 ¶ 10; Cross Decl., ECF No. 40-2 at 42-43; ECF No. 40-3 at 2.) He claims that he never received a response to the second level grievance. (Pl. Decl., ECF No. 40-1 at 23 ¶ 10.)

Defendants did not file a reply and address this argument.

In sum, Defendants did not meet their burden of establishing that Plaintiff failed to exhaust his administrative remedies through grievance 20063051288.

**c. Any Other Grievances**

Finally, Defendants argue that Plaintiff did not file any other grievances that address his claims.

While Defendants make this *argument* in their opposition, there is no *evidence* to support it. For example, they did not provide a declaration of a person who reviewed his grievance file to confirm that there are no other grievances filed on the issues proceeding in this case. Moreover, Plaintiff submits evidence that he has had "many unlogged grievances" returned to him, *i.e.*, grievances that were rejected for some reason and were never tracked any further. Defendants do not mention any of these grievances, let alone submit them, and the court cannot review them to determine whether they raised issues proceeding in this case or whether they were properly rejected by prison officials.

**4. Conclusion**

For the reasons stated above, Defendants' motion should be denied insofar as they argue that Plaintiff failed to exhaust his administrative remedies.

**B. Retaliation**

Defendants argue that the evidence does not support any retaliation claim.

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

1  reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v.*

2  *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

3       "The First Amendment guarantees a prisoner a right to seek redress of grievances from

4  prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v.*

5  *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

6       **1. Count I**

7       The retaliation claim against Vest in Count I is based on the allegation that after Vest had

8  damaged his fan, Plaintiff approached him in the dining hall and told Vest he would be filing a

9  grievance about the property damage. Vest then rushed to shakedown Plaintiff's cell, left it

10  trashed and in disarray and confiscated Plaintiff's television set under the false pretense that it

11  was altered property.

12       Defendants assert that Vest returned to Plaintiff's cell after interacting with Plaintiff at

13  breakfast in order to retrieve the damaged television in response to Plaintiff's claim that Vest's

14  removal of the antenna caused the damage. Vest took the television to place it in the evidence

15  room to preserve it for a property claim. In addition, Defendants argue that the television had

16  evidence of tampering with a makeshift antenna in violation of regulations, and so the

17  confiscation of the television advanced the legitimate goal of NNCC to enforce the rules.

18       To support this argument, Defendants point to Vest's report filed with the disciplinary

19  notice of charges. In that report, Vest states that he stopped at the cell to disconnect a prison-

20  made antenna connected to the eaves of the unit. Plaintiff then sought Vest out in the culinary

21  and stated that the cable was connected to the television and the elbow in the television was bent

22  from the cable being removed. Vest told Plaintiff he would return to the unit and take the

23  television to place it into evidence and Plaintiff would have to file a grievance and property

claim form. Vest went to the unit to retrieve the television. Vest states that Plaintiff's television had an elbow pushed on the antenna connector and the male connector was stripped. There were multiple small wires altered and attached to different connections on the television being used as prison-made antennae. Vest confiscated the television and took it to operations and completed the unauthorized property notification form. While inspecting the television, Vest also observed the factory seals covering the security screws were removed. A notice of charges was completed due to the television being altered and the security stickers being removed. (ECF No. 26-1 at 7.)

In addition, Vest argues that Plaintiff filed subsequent grievances, which belies Plaintiff's claim that his right to grieve was chilled.

Finally, Defendants generally argue that Plaintiff's accounts of these events are "uncorroborated by admissible evidence" and instead there are only conclusory allegations that are self-serving. (ECF No. 26 at 21:14-23.)

According to Plaintiff, he learned that his fan had been damaged and the cord to his television ripped out of the back of the television when Vest was outside the unit that morning ripping down digital television antennae. When Vest had reached for the antenna, it caused it to dislodge from the back of the television and it knocked Plaintiff's fan to the ground. (ECF No. 40 at 45, ECF No. 40-1 at 1.) Plaintiff went to the dining hall for breakfast and saw and approached Vest. Plaintiff told Vest he would be filing a property claim grievance about the property Vest had damaged. Right after he said this, Vest rushed to go shakedown Plaintiff's cell, leaving it trashed. In addition, he confiscated Plaintiff's television set under the false pretense that the television was altered. (ECF No. 40-1 at 1-2.)

In his declaration, Plaintiff states that he had a television antenna for digital reception that he purchased from the NNCC inmate store, and no rule or regulation prohibited him from

posting the digital television antenna in the window for reception of digital channels. He spoke to Vest when walking to the NNCC dining hall for breakfast and told Vest he had damaged Plaintiff's television set's elbow connector and fan earlier that morning when Vest had snatched the antenna out of the cell window. Plaintiff told Vest he would be filing a property claim grievance against Vest. He disputes that Vest told him he should file a property claim. (Pl. Decl., ECF No. 40-1 at 18-19 ¶¶ 1-3.) He also disputes that Vest told him he was going to go back to his cell to place the television set into evidence. (*Id.* at 19 ¶ 4.) When Plaintiff returned to his unit, he found Vest had confiscated the television set. Plaintiff believed Vest did this in retaliation. (*Id.*) Plaintiff filed an emergency grievance and asked for protection from future retaliation by Vest. (*Id.*)

Other than the elbow joint connector that was distorted when Vest took the antenna out of the television, Plaintiff maintains the television had no irregularities. There were no factory seals that were tampered with and no wires other than a store-bought and authorized headphone extension. (*Id.* at 20 ¶ 5.)

First, the court will address Defendants' argument that Plaintiff only has conclusory and self-serving allegations to support his claim. Plaintiff provides his own declaration in support of his opposition. In addition, Plaintiff includes his complaint as an exhibit to his opposition, which has been verified under penalty of perjury. "[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). "Although the source of the evidence may have some bearing on its credibility, and thus *on the weight that may be given by a trier of fact*, the district

court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id*. (emphasis added).

The court "can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Id*. (citing *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n. 5 (9th Cir. 2002) (court properly disregarded declaration that included facts beyond the declarant's knowledge). In *Nigro*, the Ninth Circuit concluded that the declaration of Nigro, albeit uncorroborated and self-serving, was sufficient to establish a genuine dispute of material fact, and the district court erred in disregarding it in granting Sears' motion for summary judgment. *Id*.

Here, Plaintiff's statements in his verified complaint as well as his declaration go beyond just conclusions. Instead, he includes detailed factual assertions regarding his version of events. Therefore, this argument should be rejected.

Next, the court finds that there are genuine disputes as to various material facts that preclude summary judgment in Vest's favor on the retaliation claim in Count I. While Vest claims that he took the television to put it in the property room as evidence and because it was altered, Plaintiff presents evidence that the television was not altered and that Vest only went back to search his cell and take the television right after Plaintiff threatened to file a property grievance claim against Vest. A reasonable fact finder could believe Plaintiff's version of events and conclude that Vest searched Plaintiff's cell and took his television because of his protected conduct: threatening to file a grievance against Vest.

The argument that Plaintiff's rights were not chilled because Plaintiff continued to file grievances is without merit. "[A] plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather than the adverse action at issue 'would chill or silence a

person of ordinary firmness from future First Amendment activities.'" *Brodheim v. Cry*, 594 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Rhodes*, 408 F.3d at 568-69). "To hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'" *Id*. at 1271 (quoting *Rhodes*, 408 F.3d at 569). Therefore, it does not matter if Plaintiff was able to file subsequent grievances, because viewing the facts in the light most favorable to Plaintiff, Vest took adverse action against him because he threatened to file a grievance and that would, objectively speaking, chill or silence a person of ordinary firmness from future First Amendment activities.

Therefore, summary judgment should be denied with respect to the retaliation claim against Vest in Count I.

**2. Count II**

With respect to Count II, Defendants argue there is no evidence beyond Plaintiff's allegations that the incident ever took place, or resulted in the alleged action taken. They again argue that Plaintiff continued to file grievances, which contradicts his claim that his First Amendment rights were chilled.

In his verified complaint, Plaintiff asserts that after he found that Vest confiscated his television and performed the shakedown of his cell, Plaintiff filed an emergency grievance requesting the return of his television and protection from further retaliatory acts. Cook told Plaintiff to go to the property sergeant and request his television set back. Vest walked into the unit to give Plaintiff the unauthorized property form for the television set he had taken. Plaintiff told Vest that along with the property claim, he would be filing a lawsuit for retaliation regarding the confiscation of the television and shake down of his cell. Vest responded that it was just a compliance check. Plaintiff said he knew the difference between a shakedown and a compliance

check, and Vest then went into Plaintiff's cell and searched it with vigor, stating: "Now this is a shakedown… You wanna sue me for a shakedown? This is a shakedown." Escamilla joined in and Cooked looked on. Even more of his property was trashed, confiscated and destroyed. Plaintiff pleaded with Cook to intervene, but Cook just told Plaintiff, "you shouldn't have pissed him off" as he stood by and watched. (ECF No. 40-1 at 2-4.)

In his declaration, Plaintiff states that two to three hours after Vest confiscated the television, Vest went back to the cell to conduct a second search after Plaintiff had told Vest he was going to sue him for taking his television in retaliation. Vest took more of his property during that search, and refused to give Plaintiff the unauthorized property form for the television. (Pl. Decl., ECF No. 40-1 at 20 ¶ 6.)

Plaintiff's claim is backed up by more than "conclusory" allegations. Plaintiff has presented evidence that shortly after he threatened Vest with a lawsuit for taking his television, Vest went back to Plaintiff's cell for another shakedown and destroyed his property. Escamilla and Cook overheard the communication between Plaintiff and Vest about the threat of grievances and lawsuits, and Escamilla still participated in the shakedown and Cook looked on despite Plaintiff's pleas that he intervene.

Again, the proper inquiry is not whether Plaintiff's ability to engage in First Amendment activities was in fact chilled, but whether a reasonable inmate would have been chilled from future First Amendment activity as a result of this conduct. A fact finder viewing evidence in the light most favorable to Plaintiff could conclude that a reasonable inmate would be so chilled.

In sum, there are genuinely disputed facts that preclude the entry of summary judgment on the retaliation claim against Vest, Escamilla and Cook in Count II. Therefore, the motion for summary judgment should be denied in that regard.

### 3. Count IV

As they did with respect to Counts I and II, Defendants argue there is no evidence beyond Plaintiff's allegations that the incident ever took place, or resulted in the alleged action taken, and that Plaintiff continued to file grievances.

In his verified complaint, Plaintiff states that after he was injured by Vest, the next day he was in so much pain he wrote an emergency medical grievance and turned it into Officer Atkinson. Somehow, contrary to policy, Vest, whom Plaintiff claimed had caused the injuries for which he needed medical attention, came to respond to the emergency grievance. Vest slid what appeared to be an emergency grievance form between the side door crack and said he had a reply for Plaintiff. When Vest saw Plaintiff slowly crawl out of bed in pain to the door to retrieve it, Vest moved the document to the top of the door to cause Plaintiff more pain. Plaintiff eventually got the document only to find it was a blank grievance form. Vest walked off laughing at Plaintiff's misery and deprived him of medical attention. (ECF No. 40-1 at 9-11.)

Defendants only argument is that there is no evidence beyond the conclusory allegations; however, Plaintiff relies on his verified complaint, which contains very specific *factual* statements about Vest's alleged conduct. These statements are sufficient to create a genuine dispute of material fact as to whether Vest retaliated against Plaintiff in his conduct with respect to the grievance about his need for medical care.

Finally, viewing the facts in the light most favorable to Plaintiff, a reasonable prisoner would be chilled from future First Amendment activities if subject to this conduct.

Therefore, summary judgment should be denied with respect to the retaliation claim against Vest in Count IV.

### 4. Count V

The retaliation claim against Vest in Count V is based on allegations that in retaliation for Plaintiff's threats to file grievances and sue him, Vest filed false disciplinary charges against Plaintiff asserting that he failed to follow rules and regulations and for possession of unauthorized property (the latter of charge was dismissed at the hearing).

Defendants argue there is no evidence that Vest fabricated or filed the disciplinary charges in bad faith. Instead, Vest contends that the record shows the television was altered and had an unauthorized antenna attached. Vest had reason to believe Plaintiff had tampered with his television against prison policy. In addition, they assert that the record shows Plaintiff failed to comply with warnings and orders.

Finally, they argue that another individual found "some evidence" to find Plaintiff guilty of one of these charges, and another upheld the guilty finding on appeal, which validates the charges.

Plaintiff maintains that he was charged for "failure to follow rules and regulations" and "possession of unauthorized property" by Vest. The unauthorized property charge was with respect to Plaintiff's television set that Vest claimed was altered. That charge was dismissed. Henley found Plaintiff guilty of the failure to follow rules and regulations charge even though Vest did not state what rule or regulation Plaintiff failed to follow, and Plaintiff maintains that there was no evidence to support the charge. (ECF No. 40-1 at 13-15.)

While Vest claims that the charges were legitimate, and that at least one of the charges was ultimately upheld, Plaintiff also presents evidence that one of the charges was dismissed and the other charge, while ultimately upheld, still lacked support. Importantly, Plaintiff maintains

that the charges were filed because of his previous protected activity against Vest: threatening to file grievances and lawsuits.

The court concludes that there are genuinely disputed facts that preclude the entry of summary judgment in Vest's favor on the retaliation claim in Count V.

**C. Excessive Force, Assault and Battery Claims**

**1. Standards**

**a. Excessive Force**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. It "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). The "unnecessary and wanton infliction of pain...constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v. McKinney*, 394 F.3d 710, 711 (9th Cir. 2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).

That being said, the Ninth Circuit has interpreted that while *Whitley* used the phrase "maliciously and sadistically," it does not requiring proof of that the officer enjoyed the use of

force. *Hoard v. Hartman*, 904 F.3d 780 (9th Cir. 2018). Instead the focus is on whether the

officer had purpose to cause harm: "[A]n officer who harms an inmate in part of a good-faith

effort to maintain security has acted constitutionally, but an officer who harms an inmate 'for the

very purpose of causing harm,' … has engaged in excessive force, provided that the other

elements of excessive force have been met." *Id.* at 788 (quoting *Whitley*, 475 U.S. at 321).

In determining whether the use of force is excessive, courts are instructed to examine

"the extent of the injury suffered by an inmate[;]" "the need for application of force, the

relationship between that need and the amount of force used, the threat 'reasonably perceived by

the responsible officials,' and 'any efforts made to temper the severity of the forceful response.'"

*Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

An inmate need not establish serious injury; however, the lack of serious injury is

relevant to the Eighth Amendment inquiry. *See Wilkins v. Gaddy*, 130 S.Ct.  1175, 1178 (2010).

"The extent of injury may also provide some indication of the amount of force applied." *Id.*

That being said, not "every malevolent touch by a prison guard gives rise to a federal

cause of action...The Eighth Amendment's prohibition of 'cruel and unusual' punishments

necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S.

at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Wilkins*, 130 S.Ct. 1178 ("An inmate who

complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a

valid excessive force claim." (citing *Hudson*, 503 U.S. at 9)). "Injury and force, however, are

only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is

gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely

because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79.

1  If the nature of the injuries is more than *de minimis*, but still "relatively modest," the inmate's

2  damages will likely be limited. *See id*. at 1180.

3  **b. Assault and Battery**

4  A plaintiff asserting a tort claim for assault must show the defendant: (1) intended to

5  cause harmful or offensive physical contact, and (2) the plaintiff was put in apprehension of such

6  contact. Restatement (Second) of Torts, § 21 (1965). To establish a claim for the tort of battery,

7  the plaintiff must establish that the defendant (1) intended to cause harmful or offensive contact,

8  and (2) such contact did occur. *Id*. §§ 13, 18; *accord Burns v. Mayer*, 175 F.Supp.2d 1259, 1269

9  (D. Nev. 2001) (citing the same); *Switzer v. Rivera,* 174 F.Supp.2d 1097, 1109 (D. Nev. 2011).

10  **2. Argument**

11  Vest argues that the evidence shows that Plaintiff pursued Vest even after he was told to

12  stop, and after Vest warned him that continuing to do so would be interpreted as an act of

13  aggression. Vest perceived Plaintiff's continued following as a threat. Vest contends that the

14  video shows that Plaintiff was on his own when he walked into Vest's outstretched hand, that

15  Plaintiff then retreated, and Vest apprehended Plaintiff with the assistance of Escamilla and

16  Cook due to Plaintiff's resistance. Therefore, Vest argues he was justified in applying some

17  force, and he used only that amount of force necessary to restrain an uncooperative inmate.

18  Finally, Vest contends that Plaintiff's medical records show that he was sent to the infirmary and

19  suffered nothing other than "possible muscle strain." Vest acknowledges that Plaintiff was

20  prescribed medication, and further concedes that Plaintiff complained of pain the next day, and

21  that he was advised to use pain medication with a warm compress, and to do stretches and

22  relaxation.

23

Plaintiff disputes Vest's version of events. According to Plaintiff, when he saw Vest leave the unit without giving him the unauthorized property form, he exited his cell behind Vest to walk over to the shift command building where he could speak with a warden or lieutenant to make Vest produce the document. Plaintiff maintains that Vest never told him to stop following him or to go to his cell. Plaintiff also disputes that Vest told him that he would take Plaintiff continuing to walk to shift command as a sign of aggression.

Plaintiff states that video footage shows Vest leaving the building first, and Plaintiff leaving the building a few seconds later. Vest headed down one side of the sidewalk and Plaintiff started down the other side, when Vest stepped into Plaintiff's path. For a split second, Plaintiff attempted to step around Vest when Vest abruptly stopped, turned around and stiff-armed Plaintiff. At that point, Vest yelled at him: "If you do not want to be the next Rodney King, back off!"  Plaintiff put his hands up in a submissive position, took one step back and slipped on the side of the sidewalk and fell backwards. He stood up and shouted to those who witnessed this, "Did y'all hear that Rodney King sh**." Then Escamilla came up from behind Plaintiff with a pepper spray gun and pointed it at Plaintiff and yelled at him to get down on the ground. Vest also yelled at Plaintiff to get down. Plaintiff responded by quickly lying down on the ground saying, "I didn't do nothin', man he threatened me."

While he was on the ground, Vest "pounced" on Plaintiff's back with his sharp knees. He placed Plaintiff into an "arm bar" while pressing his knees into Plaintiff's kidneys and pulled with all of his might, hyperextending Plaintiff's shoulder. Plaintiff cried out, "You're tryin' to hurt me! My shoulder! You're hurting me!" Vest responded, "Shut the f*** up and quit resisting!" Plaintiff maintains he was not resisting in any manner. Escamilla stood over him pointing the pepper spray gun at Plaintiff while Vest was injuring Plaintiff.

Plaintiff disputes that Vest ever instructed him to stop following him or that Vest ever told Plaintiff he would interpret any attempt to continue following him as an "act of aggression." He further disputes that Vest ever told him to return to his cell prior to Vest stopping to hold his hand out. Instead, Vest made a racist threat about making Plaintiff "the next Rodney King" before telling Plaintiff to "back off" while he turned around to stiff arm Plaintiff while Plaintiff had his hands in the air in a non-aggressive position. Plaintiff maintains that at no point was he resisting or aggressive toward Vest.

According to Plaintiff he could not stand straight for eight to ten days without debilitating back pain. In addition, his shoulder was injured for months following the incident. He experienced difficulty lifting things, he could not do pushups or pullups, his range of motion was limited, and he required help climbing in and out of his top bunk. He also suffers in pain whenever he is placed in handcuffs from behind.

### 3. Analysis

The video footage submitted as an exhibit by Vest is not particularly helpful as it does not contain audio and it does not show the portion of the incident where Plaintiff claims Vest utilized excessive force. The video shows Vest walking outdoors, followed by Plaintiff. Vest is walking on the right side of the sidewalk, and Plaintiff appears walking quickly on the left hand-side of the sidewalk. Then, Vest veers into the left-hand side of the sidewalk and abruptly turns around and puts his hand up toward Plaintiff. Plaintiff puts his hands up, steps backwards and trips on the edge of the sidewalk and falls backwards onto the ground. Plaintiff then gets up and starts walking the other way, the direction from which he had just come. Plaintiff goes out of view of the camera, and Vest is seen walking toward Plaintiff and then places a hand on Plaintiff's back,

and nothing else is shown, including the portion of the incident where Plaintiff claims Vest violently pushed his knees into Plaintiff's back and pulled his arm into hyperextension.

In addition to the video not showing the entire incident, Vest's report and Plaintiff's declaration demonstrate that what occurred is in dispute. There are disputed issues regarding the need for the application of force, and the relationship between that need and the amount of force used. Vest argues that he perceived Plaintiff as a threat when he did not heed commands to stop following him, and used only that force which was necessary to subdue an uncooperative inmate. Plaintiff disputes that Vest ever made commands, and instead contends that he was walking to operations to ask about his unauthorized property form, when Vest abruptly turned around. Plaintiff also maintains that he got down on the ground as soon as Vest commanded that he do so, and he was not resisting in any fashion when Vest drove his knees forcefully into Plaintiff's back.

Insofar as the extent of injury is concerned, the incident report states that Plaintiff complained that his back and left shoulder hurt. He also reported limited range of motion in the left shoulder. He was assessed with possible muscle strain, but there were "no other injuries present." The on-call doctor was notified, and Plaintiff had his blood pressure checked and was given an ibuprofen pain pack and baclofen. (ECF No. 28-1.) Plaintiff was seen the following day, and complained that his back hurt upon getting out of bed and he had to crawl on the floor to get to the door, although custody reported that he was seen standing at his door. He was assessed with possible lumbar muscle strain. He had a palpable muscle knot in the lumbar spine. He was directed to continue taking the ibuprofen and baclofen, and use of a warm compress, and stretching and relaxing were recommended. (ECF No. 28-2.)

There is a genuine dispute of material fact as to the extent of the injury. While Vest characterizes the injury as minimal, it was such that Plaintiff required medication and he continued to complain of pain and had a palpable muscular knot the following day. In addition, Plaintiff maintains that his pain persisted well after the date of the incident.

Insofar as the assault and battery claims are concerned, it is disputed whether Vest intended to, and did in fact, cause harm to Plaintiff.

In conclusion, a reasonable fact finder, viewing the facts in the light most favorable to Plaintiff, could believe Plaintiff's version of events. Therefore, the motion for summary judgment should be denied as to the excessive force and assault and battery claims.

**D. Eighth Amendment Deliberate Indifference**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Vest argues that he is a correctional officer and not a medical provider, and there is no evidence beyond Plaintiff's mere assertions that the alleged interaction in Count IV occurred. Instead, he argues that the evidence shows Plaintiff received immediate medical attention right after the events, as well as the day after.

Plaintiff maintains that on May 7, 2017, he was in so much pain the day after he claims he was attacked by Vest that he filed an emergency grievance for medical help. He claims that in an effort to deny Plaintiff medical help, Vest intervened and returned a copy of a blank emergency grievance so that the emergency grievance he filed was not responded to.

This is a claim asserting that Vest denied Plaintiff the ability to get medical attention; however, the evidence submitted by Defendants shows that Plaintiff was seen and evaluated by medical staff both on the day of the incident, as well as the day after the incident, May 7, 2017. (ECF No. 28-2 at 2.) Plaintiff does not address the fact that he was seen by medical staff that day

and the following day. He does not assert there was any delay in his getting medical attention due to Vest's alleged conduct.

Therefore, the court finds that summary judgment should be granted in favor of Vest on the Eighth Amendment deliberate indifference claim in Count IV.

**E. Due Process**

### 1. Summary of Claim

Plaintiff asserts a due process claim against Baca and Henley in Count V. He alleges that he was charged with possession of unauthorized property and failure to follow rules and regulations. The unauthorized property charge was dismissed, but he was found guilty of failure to file rules and regulations by Henley. Plaintiff claims that the charges did not state what rule or regulation he failed to follow, and there was no evidence to support the charge. Plaintiff appealed, and Baca denied the appeal, reasoning that Vest said the television set was altered and was contraband, but the possession of unauthorized property charge had already been dismissed.

### 2. Argument

Defendants argue that Plaintiff was given more than 24-hours' notice of the hearing, and had an opportunity to present evidence and call witnesses. In addition, they argue that Vest's narrative and the video footage show Plaintiff's refusal to comply with orders and that he was resisting; therefore, there was "some evidence" to support the guilty finding. They further argue that Vest asserted that Plaintiff possessed disallowed prison-made antennae devices, and that would justify upholding the failure to follow rules and regulations charge.

In his response, Plaintiff reiterates that the charge of failure to follow rules and regulations did not cite any specific regulation that Plaintiff was charged with violating, and so he could not prepare a proper defense. Baca then upheld the guilty finding, and again he did not

cite the specific rule that Plaintiff violated. Plaintiff also argues that the tapes of the disciplinary

hearing were destroyed and/or were never provided to Plaintiff.

### 3. The Disciplinary Charges

#### a. Possession of Contraband

Plaintiff was charged by Vest with possession of contraband on May 6, 2017. Vest's

report states that he stopped to disconnect a prison-made antenna connected to the eaves of the

unit. He disconnected the cable at a connector and removed the antenna from the eaves. Plaintiff

sought Vest out in the culinary and said the cable was connected to the television and the elbow

in the television was bent from the cable being removed. Vest told Plaintiff he would return to

the unit to take the television and it would be placed in evidence and he would have to file a

grievance and property claim form for damage sought. Vest went to retrieve the television.

Plaintiff's television had an elbow pushed on the antenna connector, and the male connector was

stripped. There were multiple small wires altered and attached to different connectors on the

television used as a prison-made antenna. Vest confiscated the television and took it to

operations and completed the unauthorized property notification. While inspecting the television,

Vest observed the factory screws covering the security screws were removed. A notice of

charges was completed due to the television being altered and the security stickers being

removed and the screws tampered with. There is also a notation that Plaintiff had two state

blankets that were custom and used as carpet and window coverings, a prison made shower bag

that was a cut-down laundry bag, and three altered coax cables. (ECF No. 26-1 at 7.)

The charge was dismissed by Henley. (*Id.* at 2.)

#### b. Failure to Follow Rules and Regulations

Plaintiff was also charged by Vest with failure to follow rules and regulations.

(ECF No. 26-2 at 7.) The report of violation states that Vest was leaving the unit to get a camera and additional paperwork, and Plaintiff followed him yelling that Vest was violating his civil rights for not issuing a DOC 1517 (unauthorized property form) for the items removed from his cell. Vest instructed Plaintiff to stop following him and Vest would take it as an act of aggression. He ordered Plaintiff back to his cell. Then, Vest stopped, turned and placed his hand in front of him and in a clear voice told Plaintiff to stop and get back. Vest reported that Plaintiff stopped and put both arms in the air, and then stepped forward into Vest's right extended arm. Plaintiff then stepped to the right, and fell to the ground. Plaintiff immediately stood up and started yelling, "See that Rodney King sh**! He pushed me! He hit me! Vest ordered Plaintiff to the ground, but he kept trying to get back to the unit and then fell to the ground. Vest dropped to his knees and began applying wrist restraints, but Plaintiff continued to resist. (ECF No. 26-2 at 7.)

Henley found Plaintiff guilty of the charge, stating that he considered Vest's report and Unit 5 video. (*Id*. at 2-3.)

**4. Analysis**

In the context of disciplinary proceedings, a prisoner possesses a liberty interest when a change occurs in confinement that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Connor*, 515 U.S. 472, 484 (1995).

When a protected liberty interest exists and a prisoner faces disciplinary charges, prison officials must provide the prisoner with (1) a written statement at least twenty-four hours before the disciplinary hearing that includes the charges, a description of the evidence against the prisoner, and an explanation for the disciplinary action taken; (2) an opportunity to present documentary evidence and call witnesses, unless calling witnesses would interfere with

1  institutional security; and (3) legal assistance where the charges are complex or the inmate is

2  illiterate. *See Wolff v. McDonnell*, 418 U.S. 539, 563-70 (1974). Furthermore, the requirements

3  of due process are not met unless "some evidence" supports the decision by the prison

4  disciplinary board. *See Superintendent, Massachusetts Corr. Inst. Wapole v. Hill*, 472 U.S. 445,

5  455 (1985).

6          Preliminarily, Defendants state that there is no evidence supporting Plaintiff's claim that

7  his parole hearing and determination were affected by the disciplinary findings so as to implicate

8  a liberty interest. Defendants cannot meet their burden on summary judgment by simply

9  concluding that Plaintiff has no evidence to support his claim. If Defendants argue that Plaintiff

10  does not have an implicated liberty interest, they must provide evidence to support that

11  argument. Fed. R. Civ. P. 56(c)(1) (a party asserting a fact cannot be or is genuinely disputed

12  must support the assertion by citing to particular parts of the record including depositions,

13  documents, discovery responses or other materials, or by "showing" that the other side cannot

14  produce admissible evidence to support the fact).

15          Assuming that a liberty interest is implicated, the court must now determine whether

16  Plaintiff was given all the process he was due.

17          Plaintiff's first contention is that he was not given adequate notice of the charges against

18  him because the notice did not say which rule or regulation he was charged with violating. The

19  Ninth Circuit has noted that *Wolff* "provides little guidance as to the specificity of notice

20  necessary to satisfy due process." *Zimmerlee v. Keeney*, 831 F.2d 183, 188 (9th Cir. 1987). In

21  *Zimmerlee*, the Ninth Circuit found that notice was adequate where it provided facts and dates

22  sufficient to allow the inmate to marshal facts for his defense. *Id*.

23

1    Here, the notice of charges was for failure to follow rules and regulations. While the

2    notice did not state the specific rule Plaintiff was charged with violating, the report of violation

3    contained within the notice of charges gave Plaintiff the factual basis for the charges: that Vest

4    claimed he told  Plaintiff to stop following him, and then told him to stop and get back, and

5    subsequently to get to the ground but Plaintiff kept trying to get the ground and resisted when

6    Vest attempted to restrain him. This was sufficient information to allow Plaintiff "to marshal the

7    facts and prepare a defense." *Wolff*, 418 U.S. at 564.

8    Plaintiff's next contention is that the hearing officer's decision was not supported by

9    "some evidence." "[T]he requirements of due process are satisfied if some evidence supports the

10   decision by the prison disciplinary board[.]" *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S.

11   445, 455 (1985); *see also Wapole v. Hill*, 472 U.S. 445, 454-55 (1984) (citations omitted).

12   "Ascertaining whether this standard is satisfied does not require examination of the entire record,

13   independent assessment of the credibility of witnesses, or weighing of the evidence. Instead the

14   relevant question is whether there is *any* evidence in the record that *could* support the conclusion

15   reached by the disciplinary board." *Id.* at 455-56 (citations omitted) (emphasis added). The court

16   is "not to make its own assessment of the credibility of witnesses or reweigh the evidence." *Cato*,

17   824 F.2d at 705 (citing *Hill*, 472 U.S. at 455).

18   The hearing officer said he relied on the officer report and a Unit 5 video. The court

19   understands that Plaintiff disputes Vest's report; however, the court is not permitted to re-weigh

20   the evidence or make credibility determinations in its analysis. Instead, the court must determine

21   whether there is *any* evidence that *could* support the hearing officer's guilty finding. The court

22   concludes that the hearing officer could have relied on Vest's statement that Plaintiff ignored

23

1    orders to stop following him, and then resisted when Vest and Escamilla were trying to restrain

2    Plaintiff as some evidence to support the charge of failing to follow rules and regulations.

3            Plaintiff argues that summary judgment should be denied because Defendants did not

4    retain and produce a recording of the disciplinary hearing. Plaintiff does not specifically argue

5    how the recording is relevant to his claims proceeding here. Instead, the court's inquiry is

6    focused on whether Plaintiff had adequate notice of the charge against him, and whether there

7    was any evidence to support the hearing officer's finding.

8            Since Plaintiff received adequate notice of the charge against him, and because there was

9    some evidence to support the disciplinary finding, summary judgment should be granted in favor

10   of Henley and Baca on the due process claim.

11   **F. State Constitutional Claims**

12           **1. Private Right of Action**

13           Defendants acknowledge that Article 1, Section 6 of the Nevada Constitution mirrors the

14   Eighth Amendment's Cruel and Unusual Punishment Clause, and that Article 1, Section 9 of the

15   Nevada constitution provides free speech protections that are coextensive with the First

16   Amendment of the United States Constitution. (ECF No. 26 at 11:3-7.) They argue, however,

17   that there is no private right of action under these provisions of the Nevada Constitution because

18   neither expressly provide for a private right of action.

19           The court disagrees. Courts within this district have applied the same legal standards to

20   the cruel and unusual punishment corollary included in Article 1, Section 6 and the provision of

21   Article 1, Section 9 of the Nevada Constitution as are applied to the corollaries in the United

22   States Constitution, and have allowed such claims to proceed. *See Fowler v. Sisolak,* No. 2:19-

23   cv-01418-APG-DJA, 2020 WL 6270276, at *4 (D. Nev. Oct. 26, 2020); *Hano v. Nevada,*

No. 2:19-cv-02246-GMN-EJY, 2020 WL 5502153, at *7 (D. Nev. Sept. 3, 2020); *Lopez v. Homan,* No. 3:19-cv-00098-RCJ-WGC, 2020 WL 3949260, at *9 (D. Nev. May 11, 2020), *adopted at* 2020 WL 3956297 (D. Nev. Jul. 9, 2020); *Cross v. Jaeger,* ECF Nos. 4,6 in case 3:13-cv-00433-MMD-WGC; *Hutchins v. Nev. Dep't of Corr.*, No. 3:10-cv-00369-LRH, 2011 WL 7575728, at *4 n. 3 (D. Nev. Oct. 5, 2011), *adopted at* 2012 WL 993372 (D. Nev. Mar. 22, 2012), *order corrected on reconsideration* at 2012 WL 1982482 (D. Nev. June 4, 2012).

Moreover, the Nevada Supreme Court has noted the similarity between the federal and state constitutions, and frequently looks to federal precedent to guide their analysis. *See e.g. Hernandez v. Bennett-Haron*, 387 P.3d 305, 310, 128 Nev. 580, 587 (2012) (citation omitted); *Coyote Publishing, Inc. v. Miller,* 598 F.3d 592, 597 n. 5 (9th Cir. 2010) (citing *Univ. & Cmty. Coll. Sys. of Nevada v. Nevadans for Sound Gov't*, 100 P.3d 179, 187, 120 Nev. 712, 722 (2004)) ("Article 1, Section 9 affords no greater protection to speech activity than does the First Amendment to the United States Constitution[,] …[therefore,] under the Nevada Constitution, the appropriate analysis of … restrictions [on speech] is identical to that under the First Amendment."); *see also Taylor v. Las Vegas Metro. Police Dep't*, 2:19-cv-00995-JCM-NJK, 2019 WL 5839255, at *15 (D. Nev. Nov. 7, 2019), *reconsideration denied,* 2020 WL 620275 (D. Nev. Feb. 10, 2020).

Therefore, insofar as they request summary judgment as to the State constitutional claims on this basis, Defendants' motion should be denied.

**2. Summary Judgment Should be Granted as to the Nevada Constitution's Corollaries to the Eighth Amendment Deliberate Indifference to Serious Medical Needs and Fourteenth Amendment Due Process Claims**

Since the Nevada Supreme Court has utilized the federal legal standards as a guideline for the corollary State constitutional claims, summary judgment be granted in favor Vest for the Eighth Amendment deliberate indifference to serious medical need claim, and in favor of Henley and Baca as to the State due process claims as the court has recommended that summary judgment be granted in these Defendants' favor on these claims.

**3. Discretionary Immunity**

Defendants argue that to the extent the court finds a private right of action exists, the NDOC employees are entitled to discretionary immunity under Nevada law.

They argue that there is no evidence that Vest, Escamilla, or Cook took any action that exceeded the bounds of their discretion, relying on Nevada Revised Statute (NRS) 41.032(2). Instead, they claim that whether they performed a search of his cell, or used force to restore order, those actions "involve an element of individual judgment or choice." (ECF No. 26 at 13.)

Plaintiff argues that when the actions of the Defendant are attributable to bad faith, discretionary immunity under NRS 41.032 does not apply.

NRS 41.032(2) provides that no action may be brought against a public officer "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty … whether or not the discretion involved is abused." State actors are entitled to discretionary-function immunity if their decision: "(1) involve[s] an element of individual judgment or choice and (2) [is] based on consideration of social, economic, or political policy."

1  *Sandoval v. Las Vegas Metro Police Dept.*, 756 F.3d 1154, 1168 (9th Cir 2014) (citation and

2  quotation marks omitted).

3      "Police officers exercise[ ] discretion and [are] thus generally immune from suit where

4  the act at issue required personal deliberate, decision, and judgment, rather than obedience to

5  orders, or the performance of a duty in which the officer is left no choice of his own." *Id.*

6  (citations and quotation marks omitted). "But where an officer's actions are attributable to bad

7  faith, immunity does not apply whether an act is discretionary or not." *Id.* (quotation marks and

8  citation omitted). "[W]here an officer arrests a citizen in an abusive manner not as the result of

9  the exercise of poor judgment as to the force required to make an arrest, but instead … because

10  of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's

11  actions are the result of bad faith and he is not immune from suit." *Id.* (quotation marks and

12  citation omitted).

13      Factual disputes preclude the application of discretionary immunity to the remaining

14  State law Constitutional claims under Article 1, Section 6 of the Nevada Constitution and Article

15  1, Section 9 of the Nevada Constitution. This is because viewing the facts in the light most

16  favorable to Plaintiff, a reasonable juror could find that the officers acted in bad faith by utilizing

17  excessive force against Plaintiff without provocation, and in retaliating against Plaintiff.

18  **G. NDOC and the State of Nevada**

19      Defendants argue that because all of the State law claims against the NDOC employees

20  fail, they also fail as to the NDOC and State of Nevada.

21      Here, the court has concluded that certain State law claims should proceed against the

22  NDOC employees because of disputed facts; therefore, these claims should proceed against the

23  State and NDOC.

**H. Qualified Immunity**

Finally, Vest argues he is entitled to qualified immunity for the excessive force claim because no court has held that a restrained, non-lethal use of force resulting in minor injury to an inmate after multiple warnings to comply violates the Eighth Amendment. In addition, Vest contends that he complied with appropriate use of force regulations.

"To determine whether an official is entitled to qualified immunity, [courts] ask two questions: (1) whether the official's conduct violated a constitutional rights; and (2) whether that right was 'clearly established' at the time of the violation." *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019) (citation omitted).

First, there are disputed questions of fact as to whether Vest used excessive force. Taking the facts in the light most favorable to Plaintiff, a fact finder could conclude that the force utilized was excessive under the circumstances.

Second, the court finds that the right was clearly established at the time of the asserted violations.

Vest's qualified immunity argument rests on the court adopting his version of events; however, according to Plaintiff, Vest violently shoved his knees into Plaintiff's back and pulled his shoulder back causing it to become hyperextended when he had followed all commands and was not resisting and Plaintiff cried out in pain. It was clearly established that an inmate has a constitutional right to be free from excessive force used maliciously and sadistically to cause harm. *See Hudson*, 503 U.S. at 7 (holding that guards violated Hudson's Eighth Amendment rights when they gratuitously punched and hit him, causing only minor injuries, while escorting him between prison facilities). A reasonable officer would have known that intentionally

41

harming a prisoner who was not resisting and was acting cooperatively with attempts to restrain him without a permissible purpose violates the Eighth Amendment).

Therefore, Vest's motion should be denied insofar as he contends that he is entitled to qualified immunity as to the excessive force claim.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No. 26) as follows:

The motion should be **GRANTED** with respect to the federal and state deliberate indifference to serious medical needs claims against Vest in Count IV, and with respect to the federal and state due process claims against Baca and Henley in Count V.

The motion should be **DENIED** with respect to the state and federal retaliation claims in Counts I (Vest), II (Vest, Escamilla and Cook), IV (Vest) and V (Vest), and as to the federal and state excessive claims against Vest, and the state assault and battery claims against Vest, the State of Nevada and NDOC in Count III.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: November 10, 2020

William G. Cobb
United States Magistrate Judge